Filed 2/26/25  P. v. Wells CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARLIN MERRILL WELLS,<br><br>    Defendant and Appellant. | F087024<br><br>(Super. Ct. No. CRM028515)<br><br><br>**ORDER MODIFYING OPINION**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on February 25, 2025, be modified in the following particulars:

1.  On page 1, replace the language in the editorial footnote * with the following:

    *     Before Levy, Acting P. J., DeSantos, J., and Fain, J.†

    †     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

There is no change in the judgment.

LEVY, A. P. J.

WE CONCUR:


DESANTOS, J.


FAIN, J.[†]

---

[†]     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARLIN MERRILL WELLS,<br><br>    Defendant and Appellant. | F087024<br><br>(Super. Ct. No. CRM028515)<br><br><br>**OPINION** |

**THE COURT**[*]

APPEAL from an order of the Superior Court of Merced County.  Stephanie L. Jamieson, Judge.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., DeSantos, J. and Fain, J.

## INTRODUCTION

Appellant and defendant Marlin Merrill Wells (appellant) was convicted and sentenced to prison in three separate cases for sexually molesting three children over the span of 30 years: his eight- or nine-year-old stepdaughter in 1983, and a 13-year-old boy in 1999, both occurring in Washington State; and John Doe, his 14-year-old grandson, in Merced County in 2014.

While he was completing his prison sentence for the Merced County convictions, a petition was filed under the provisions of the Sexually Violent Predator Act (the Act) that alleged appellant was a sexually violent predator (SVP) and should be committed to the State Department of State Hospitals (the DSH). (Welf. & Inst. Code, § 6600 et seq.) At the jury trial on the petition, two experts testified for each side, the trial court admitted certified records of his prior sexual molestation convictions, and the jury found the petition's allegations were true. The court committed appellant to the DSH.

On appeal from the commitment order, appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, but also requested this court exercise its discretion to independently review the record to address two specific issues: whether the court properly admitted evidence about a prior conviction, and if the jury's finding on the petition is supported by substantial evidence.

In response to this court's *Wende* letter, appellant separately filed, in propria persona, a lengthy letter brief that also challenged the sufficiency of the evidence and the admission of his prior convictions, and raised other contentions as to the provisions of the Act. We exercise our discretion to independently review the record, address these contentions, and affirm.

## FACTUAL BACKGROUND

We begin with a brief summary of appellant's prior sexual molestation convictions in Washington State to establish the timeline of his offenses. We will address the facts of

2.

the Washington convictions in detail below, based on the evidence introduced at the jury trial on the SVP petition.

## APPELLANT'S PRIOR CONVICTIONS IN WASHINGTON

On November 28, 1983, appellant (born 1939) was convicted in Seattle, King County, Washington, of the statutory rape of A., his stepdaughter, who was eight or nine years old when he committed the offense (former RCW 9A.44.070). On May 15, 1984, appellant was sentenced to not more than 20 years in prison. In 1999, appellant was released on parole.

On September 23, 1999, appellant was convicted in Vancouver, Clark County, Washington, of two counts of second degree child molestation of B., a 13-year-old boy (RCW 9A.44.086). On June 15, 2000, he was sentenced to 116 months in prison. In December 2012, appellant was released from prison and into community custody in Washington.

## APPELLANT'S CONVICTIONS IN MERCED COUNTY

In 2014, appellant was convicted in Merced County of sexually molesting John Doe, his 14-year-old grandson, while he was still on community custody in Washington. Appellant committed the offenses under the following circumstances.

### Preliminary Hearing Evidence[1]

Los Banos Police Officer Jacob Bento testified that on July 12, 2013, John Doe, a confidential minor victim (born 1998), arrived at the police department with his aunt, and said he wanted to make an appointment with detective Justin Melden. Melden was busy so Bento interviewed John Doe at the police department.

John Doe reported that appellant sexually molested him. Appellant was John Doe's grandfather, and appellant's son was John Doe's father. In his statement to

---

[1]     At the jury trial on the SVP petition, the court admitted the certified records from appellant's three prior convictions into evidence, including the preliminary hearing that led to his pleas for molesting John Doe.

Bento, John Doe stated that in mid-June 2013, his family drove from their home in Los Banos to Washington State to pick up appellant from some kind of facility. On the return drive, the family parked near a casino in Washington, and everyone slept in the car overnight. John Doe stated that while the others were asleep, appellant began manipulating John Doe's pants, rubbed him beneath his underpants, and touched his penis on top of his underwear. John Doe said he pretended to be asleep when appellant touched him, then got out of the car to get away from appellant.

John Doe stated that when the family returned to their home in Los Banos, he was told that he was going to share a bedroom with appellant. John Doe said that one night, he had been partying with friends and became intoxicated. John Doe went to bed while still wearing his pants, and appellant was not present. He woke up because appellant had unbuttoned and pulled down his pants, removed his penis from his boxer shorts, and was squeezing his penis and touching his buttocks. John Doe said he pretended to be asleep "during most of the touching, but then he couldn't stand it anymore and woke." John Doe said that as he sat up, appellant rubbed his back and asked if everything was okay.

On July 16, 2013, Melden went to the residence where John Doe lived with his family. Melden met with both appellant's son, M.W., and the son's girlfriend, and asked to speak to appellant. They initially said appellant was not there, but M.W. eventually admitted appellant was present. M.W. also said he thought John Doe (his own son) was lying about the allegations but then he talked to appellant, who admitted there had been some inappropriate contact.

Melden testified he met with appellant and advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Appellant said "he has a problem. He woke up next to [John Doe] with his hand on the juvenile's penis, and he referenced two prior incidents that he was arrested in and stated that he needed help." Melden asked about the

4.

incident in the car while driving back from Washington. Appellant said he touched John Doe's thigh but in a nonsexual manner.

**Plea and Sentencing Hearings**

On October 7, 2014, appellant pleaded no contest to four counts of committing lewd or lascivious acts on John Doe, where the victim was 14 or 15 years old and appellant was at least 10 years older than the minor, on or between June 1 and July 12, 2013. (Pen. Code,[2] § 288, subd. (c)(1).)

Appellant admitted he had one prior strike conviction (§§ 667, subds. (b)–(i), 1170.12) and one prior prison term enhancement (§§ 667.5, subd. (b), 668), based on his rape conviction in Seattle, Washington in 1983.[3]

On December 29, 2014, the trial court sentenced appellant to the indicated second strike sentence of 11 years, and ordered him to register as a sex offender (§ 290).

## SVP PROCEEDINGS

On April 9, 2020, while appellant was completing his prison sentence in the Merced County case, the district attorney filed a petition pursuant to Welfare and Institutions Code section 6600 et seq., alleging appellant was an SVP, he had an expected parole date of April 19, 2020, and he should be committed to the DSH for an indeterminate term. In support of the petition, the People filed certified mental health evaluations prepared by Dr. William Damon and Dr. Gangaw Zaw on behalf of the DSH.

On May 5 and 8, 2020, the trial court conducted a hearing and found probable cause to hold appellant, and set the matter for a jury trial on the petition. Thereafter,

---

[2]   All further statutory citations are to the Penal Code unless otherwise indicated.

[3]   The information alleged a second prior strike conviction and prior prison term enhancement based on appellant's conviction for the sexual molestation of B. in Vancouver, Washington in 1999, but the allegations were dismissed as part of the negotiated disposition.

appellant was transferred from the Department of Corrections and Rehabilitation (CDCR) to the DSH at Coalinga State Hospital.

## EVIDENCE INTRODUCED AT JURY TRIAL ON PETITION

On September 14, 2023, appellant's jury trial began on the SVP petition.[4]  The witnesses consisted of two experts called by the People, two experts called by appellant, and the admission into evidence of certified copies of the records from appellant's prior sexual molestation convictions committed against A. in 1983, B. in 1999, and John Doe in 2014.

As will be fully discussed below, at a jury trial on an SVP petition, "the People must prove three elements beyond a reasonable doubt:  (1) the person has suffered a conviction of at least one qualifying 'sexually violent offense,' (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and safety of others,' and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody."  (*People v. Yates* (2018) 25 Cal.App.5th 474, 477 (*Yates*).)

## THE PEOPLE'S EXPERT WITNESSES

### Dr. Damon

Dr. Damon, a clinical psychologist, was employed by the DSH to evaluate inmates to determine if they meet the criteria as an SVP under the Act.  Dr. Damon evaluated appellant four times at Coalinga State Hospital, with the last evaluation occurring in July 2023.  He reviewed appellant's criminal history and interviewed him about his

---

[4]  On February 23, 2023, Judge Carol Ash convened appellant's first jury trial on the SVP petition.  On March 10, 2023, after one day of deliberations, the jury informed the court that it was unable to reach a verdict, and a mistrial was declared.

The following evidentiary summary is taken from appellant's second jury trial on the SVP petition, presided over by Judge Stephanie L. Jamieson, where the jury found the petition was true.

6.

convictions for sexually molesting the three minor victims, and appellant discussed the facts and circumstances of the prior offenses.

As to the first requirement under the Act, Dr. Damon testified all of appellant's prior sexual molestation convictions were qualifying offenses under the Act.

### *Appellant's 1983 Conviction in Washington*

Dr. Damon testified appellant committed his first sexual offense in 1983, when he was 42 or 43 years old. Appellant made the following statements about this offense. He had been living with his second wife and her eight-year-old daughter, A., for a couple of years. Appellant found out his wife was cheating on him, he became angry, and he "began engaging in sexual behavior with [A.]" to get back at his wife (the child's mother).

Appellant said he would wait for his wife to leave the house, take the child to his bedroom and remove her clothes, and touch her vagina. Appellant admitted he inserted his finger and penis into A.'s vagina, masturbated in her presence, and told A. not to tell anyone. Appellant said he engaged in this conduct weekly or every other week, for eight to nine months.

Appellant admitted he found the behavior arousing. He knew it was wrong at the time, he tried to fight the urges to engage in sexual behavior with the child, but he was only successful about 50 percent of the time. Dr. Damon testified that in subsequent interviews, appellant downplayed both the nature and frequency of his sexual molestations of A.

Dr. Damon testified appellant's conviction for sexually molesting A. in Washington was the equivalent of a violation of section 288, subdivision (a), commission of a lewd or lascivious act on a child under the age of 14 years, and it constituted a qualifying sexually violent offense under the Act.

7.

### *Appellant's 1999 Conviction in Washington*

Dr. Damon testified appellant also discussed the facts leading to his 1999 conviction. The victim was B., a 13-year-old boy, who lived next to appellant's sister, J. Appellant said he sexually molested B. at least 10 times in six months. Some of the incidents occurred on J.'s property, when appellant and B. worked on cars together, and appellant rubbed the boy's penis both over and under his clothes. On other occasions, appellant pulled the boy into a shed and orally copulated him, rubbed his penis against the boy's penis, and masturbated.

Appellant said he also molested B. when appellant went out of town to a car show with J., J.'s boyfriend, and B. Everyone slept in one tent located on the property of J.'s friend. Appellant said that on both nights, he waited for the other adults to fall asleep, and then he masturbated and orally copulated B., and rubbed his penis against B.'s buttocks.

Appellant talked about another incident that occurred when they were out of town. Appellant had been at the car show with B., and they walked back to the tent because B. had to take his medication. Appellant "had to stop several times on the walk back [to the tent] due to his hip pain." When they reached the tent, appellant performed an act of masturbation on B.

Appellant admitted he was attracted to and sexually aroused by B., and knew his behavior was wrong. He tried to fight his urges to engage in sexual behavior with B., but he was only successful 50 percent of the time and was not concerned about the consequences. Dr. Damon testified that in subsequent interviews, appellant again downplayed the nature and frequency of his sexual conduct with B.

Dr. Damon testified appellant's convictions in Washington for sexually molesting B. were the equivalent of violating former section 288a, subdivision (c)(1), oral

8.

copulation of a child under the age of 14 years, and constituted qualifying sexually violent offenses under the Act.[5]

### *Appellant's 2014 Convictions in Merced County*

Dr. Damon testified appellant also talked about his Merced County convictions. Appellant said he was released from prison after serving his sentence for molesting B., and placed on community supervision in Washington. Appellant said that shortly after he "got off" supervision, M.W. drove to Washington to take him back to California because he was going to live with M.W.'s family. M.W. arrived with his girlfriend and his own two sons (appellant's grandsons): 14-year-old John Doe and Doe's 18-year-old brother, Z.W.

Appellant said that on the drive back to California, they parked overnight and everyone slept in the car. Appellant slept in the backseat with his two grandsons. He had never met them and they were strangers to him. Appellant admitted he touched John Doe's thigh, but he denied John Doe's other allegations about what happened in the car.

Appellant said when they arrived at M.W.'s home in California, he shared a bedroom and a bed with both John Doe and Z.W. One night, John Doe became intoxicated and went to bed. Appellant woke up with his arm around John Doe, who pulled away from him. Appellant admitted "he may have done two things that John Doe alleged," and touched his buttocks and his pubic hair above his penis, but denied removing John Doe's pants or doing anything else.

Dr. Damon testified appellant's convictions for violating section 288, subdivision (c)(1), committing lewd or lascivious acts on John Doe, where the victim was

---

[5]     Former section 288a, subdivision (c)(1) has been renumbered as section 287, subdivision (c)(1) without substantive change. (Stats. 2018, ch. 423, § 49, eff. Jan. 1, 2019; Senate Bill No. 1494 (2017–2018 Reg. Sess.); *People v. Dorado* (2024) 105 Cal.App.5th 717, 724, fn. 2.)

14 or 15 years old and appellant was at least 10 years older than the child, were qualifying sexually violent offenses under the Act since appellant "engaged in the behavior by force because John Doe was sleeping at the time of the offenses and therefore could not resist [appellant's] advances."

### ***Diagnosed Mental Disorder***

Dr. Damon testified the next requirement for the SVP petition was to determine whether appellant had a "diagnosed mental disorder," defined as a "congenital or a[n] acquired condition that affects the emotional or volitional capacity predisposing the individual to criminal sexual acts to a degree constituting him a menace to the health and safety of others."

Dr. Damon diagnosed appellant with "[o]ther specified paraphilic disorder, sexual interest in … prepubescent and pubescent children," as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR). Appellant "engaged in sexual behavior with prepubescent and pubescent children for a period of approximately 30 years from the early 80s until 2013. And when I talked to [appellant] initially, he admitted sexual interest in children. And I asked him when is the first time you experienced that, and he said it was with the first victim, [A.], and when I asked him when was the last time you experienced that he said with my grandson [John Doe]."

Appellant was 73 years old when he molested John Doe. Appellant was 80 years old when Dr. Damon initially interviewed him in 2020. At that first interview, appellant said he had an average sex drive, fantasies of teen boys were always present, and he masturbated about once a month. In later interviews, appellant claimed he had minimal to no sexual drive or interest.

10.

### *Likelihood to Commit Sexual Offenses*

Dr. Damon testified someone is volitionally impaired if the person has serious difficulty controlling his sexually offending behavior, and the person's behavior is unlikely to be deferred or stopped by the risk of criminal punishment.

In Dr. Damon's opinion, appellant had difficulty controlling his behavior because he continued to sexually molest children despite prior arrests, convictions, prison sentences, registration requirements, and mandatory treatment programs while in custody and on parole. When appellant was initially released from prison after serving the sentence for molesting A., he violated community release because he had contact with children in 1991. He was still on supervised release and attending weekly treatment sessions when he sexually molested B. in 1999. However, appellant claimed he never had a problem complying with community release, and he could not recognize his past problems.

Dr. Damon believed appellant was still suffering from his sexual disorder, because there had to be evidence of no new sexual offenses in five years in an uncontrolled environment in the community and out of custody. However, appellant sexually molested B. and John Doe shortly after he was released from custody in his prior cases.

### *Risk Assessment Scores*

Dr. Damon testified appellant posed a serious and well-founded risk of reoffending because of his mental disorder and volitional impairment. Appellant had a score of two on the STATIC-99R, an actuarial measure of risk assessment, placing him in the average risk range. Appellant's score on the Violence Risk Scale- Sexual Offense Version (VRS-SO), a dynamic risk assessment tool, placed him in the above average risk category. When the two scores were combined, appellant was in the average risk category.

Dr. Damon also considered two case-specific factors that were significant predictors of sexual recidivism but not fully captured by the actuarial assessments.

One factor was appellant's emotional identification with children, which was relevant because when appellant was asked about molesting B., he said, " 'I seem to attract young people. I'm always getting close to them,' " and he found it easier to relate to teens than adults. Dr. Damon believed that when appellant molested B. during the weekend trip to the car show, appellant essentially went on a "double date" with B., along with J. and her boyfriend.

Another case-specific factor was appellant's poor problem solving that led to risky behavior. When appellant discovered his second wife was cheating on him, he did not attempt to resolve the issue with her but instead sexually molested her daughter, A. When appellant was released from prison and into the community, he said he felt lonely and lacked social support. Instead of seeking additional help through sexual offender treatment, he sexually molested B. because he said " 'Hey, if I go back to prison, I'll be with friends.' " In 2013, after serving prison sentences for sexually molesting A. and then B., he slept in the same bed with 14-year-old John Doe and sexually molested him.

Dr. Damon was also concerned about appellant's postrelease plans to again live with his son and his family. Appellant did not think this would be a high-risk situation because he claimed he was not likely to reoffend. Dr. Damon disagreed because appellant would be living with the same people who let him sleep in the same room with his grandson.

Dr. Damon believed appellant's low score on the STATIC-99R likely underestimated his risk level. If appellant had been similarly evaluated after he was released from prison for molesting A., his score would have been a negative one with a below average risk, but he then molested B. If he had been evaluated after serving his sentence for molesting B., his score would have been zero, again placing him in the below average risk category, but he then molested John Doe.

### *Appellant's Age and Health*

At the time of the jury trial on the SVP petition, appellant was 83 years old. Dr. Damon testified appellant had health and vision problems and needed a walker, but these factors would not decrease his ability to reoffend. The research generally showed the risk of sexually reoffending decreased at age 40, and decreased again at age 60. Appellant was in his early 40s when he molested A., he was in his late 50s when he molested B., and he was 73 years old when he molested John Doe.

Dr. Damon testified appellant's age and health problems did not impede his ability to sexually reoffend because he did not rely on strength, speed, or endurance to molest the minor victims. Instead, his criminal history showed that he used opportunity and manipulation to reoffend and sexually molest children. In addition, appellant had reoffended even when suffering from physical problems. Appellant said he had shingles in his eye in the late 1990s, which led to vision problems, but he reoffended after that time. Appellant already had mobility issues when he molested B., because both appellant and B. said as they walked back to the tent, they had to stop several times because of appellant's hip pain. However, appellant still molested B. when they reached the tent.

Dr. Damon concluded that appellant "has already engaged in sex offending behavior at times when he was supposedly at reduced risk. So the idea that well, he won't do it now just does not seem very convincing to me."

### Dr. Zaw's testimony

Dr. Zaw, the People's second expert, was a consulting psychologist with the DSH, and previously a treatment provider at Coalinga State Hospital. She conducted four evaluations of appellant, most recently in the summer of 2023.

Dr. Zaw testified that based on her review of appellant's records and his own statements during their meetings, appellant had a total of seven convictions for committing qualifying sexually violent offenses against three victims: A., B., and John Doe.

13.

Dr. Zaw diagnosed appellant with pedophilic disorder, a chronic condition that "doesn't go away." The criteria for pedophilic disorder was that over a period of six months, a person has fantasies, urges, or behaviors involving a prepubescent child or children generally 13 years or younger, the person acted on those urges, and there's impairment resulting from those urges or behaviors. Dr. Zaw's diagnosis was based on evidence that he molested the first victim, A., over a period of six months, and then molested the second victim, B., over another period of six months.

Dr. Zaw testified appellant's behavior made him both volitionally and emotionally impaired, because he repeatedly reoffended each time he was released from custody, placed in the community, and had the opportunity to molest a child, and he failed to recognize the harm he was causing to the victims. In 1999, appellant reoffended by sexually molesting B. even though he was still on supervised release and receiving treatment arising from his conviction for molesting A. His lack of sexual misconduct in prison was not relevant because there were no children around him.

Dr. Zaw scored appellant a two on the STATIC-99R, placing him in the average range to reoffend. She also scored him using the VRS-SO, and concluded he was most comparable to the "high risk, high needs" population.

Dr. Zaw testified appellant posed a serious and well-founded risk of sexually reoffending. It was significant that he again reoffended when he was 73 years old and molested John Doe. These later offenses showed that even with his low score, appellant was not an average risk individual or the typical offender reflected in the STATIC-99R routine sample group.

Dr. Zaw acknowledged appellant's age and health problems, but testified he was generally healthy, he was not paralyzed or bedridden, he could perform the activities of daily living, and his energy level was "still pretty high." Appellant was capable of reoffending based on how he committed the prior sexual molestations.

Dr. Zaw testified she was concerned appellant did not have a treatment plan set up for his release.  Appellant said "he's planning to move in with his son and I know he's planning to move out of state .…"  Dr. Zaw did not know if he would have exposure with his grandchildren, and it seemed he would be in "kind of the same situation that was similar before he came to prison and the hospital."

**APPELLANT'S EXPERT WITNESSES**

**Dr. Korpi**

Dr. Douglas Korpi, a psychologist, was a forensic evaluator who had conducted SVP evaluations for 20 years.  He reviewed the entirety of appellant's records, and met with appellant for one evaluation in May 2021.

Dr. Korpi acknowledged appellant was convicted of committing qualifying sexually violent offenses committed against the three victims.  Dr. Korpi also diagnosed appellant with pedophilic disorder and other specified pedophilic disorder, that meant he was interested in both children and teenagers, and the disorder would not go away. Dr. Korpi further testified appellant's mental disorder resulted in volitional impairment, and his history showed that it was hard for him to control his behavior.  Appellant had not completed the modules in the sex offender treatment program since he had been at Coalinga State Hospital.  Appellant told Dr. Korpi that when he was released, it would be "nice" to attend sex offender treatment but did not think he needed to.

Dr. Korpi testified appellant did not meet the SVP criteria because he was not likely to reoffend.  He scored appellant at two on the STATIC-99R, that placed him in the average range, with a five to 11 percent probability of reoffending over five years. Dr. Korpi also used the STATIC-2002R, and appellant's score was six, with a 19 to 23 percent probability of reoffending over five years.  Dr. Korpi used the STABLE test to assess appellant's dynamic risk factors, instead of the VRS-SO test that was more open to subjectivity.

15.

Dr. Korpi testified his opinion that appellant was not likely to reoffend was based on appellant's advanced age and current medical problems, which he considered the only relevant factors in this case. Appellant had coronary artery disease, high blood pressure, high cholesterol, prostate problems, and vision and hearing problems. Appellant's hips were degenerating, he had to use a walker or cane, and he was a fall risk. Dr. Korpi acknowledged appellant was stable with medication.

Dr. Korpi testified appellant's history showed his sexual appetite was slowing down, consistent with aging and medical problems, because his body was falling apart. "[W]e look at the arc of his life. I mean … he started out, the sex-offending lasted against the very first victim [A.] for about a year, and very robust sexual acting out. And the second victim [B.] was for about six months. Not quite as a robust sexual appetite. And then the last victim in 2013 [John Doe]—which, by the way, we wouldn't expect, given his age of 73 at that time—any way, the last victim was, you know, only twice and happened over a brief period of time. So we can see … he's slowing down in terms of his sexual appetite." Appellant was "no longer a serious and well-founded risk."

Dr. Korpi conceded it was "weird" that appellant reoffended when he was 73 years old and sexually molested John Doe, "[s]o this is a weird case," and appellant was a statistical anomaly outside of the actuarial studies. However, he concluded appellant's physical condition was worse now that he was 83 years old, so that he was no longer the same risk he was when he was 73 years old.

**Dr. Abbott**

Dr. Brian Abbott, a clinical psychologist, conducted forensic psychological evaluations for SVP proceedings. He evaluated appellant in October 2022.

Dr. Abbott assumed but did not offer an opinion as to whether appellant's prior sexual molestations were qualifying convictions because that was for the jury to decide.

Dr. Abbott testified appellant did not currently suffer from any legally defined mental disorder within the meaning of the Act because he did not have a sexual

preference for nonconsenting partners, including prepubescent children. While appellant had been sexually aroused by underage children, Dr. Abbott testified that fact was insufficient evidence to conclude he suffered from pedophilic disorder.

Based on appellant's records for the previous six to 12 months, Dr. Abbott did not see any recent indicia that appellant had serious difficulty with volitional control of his prior behavior. Dr. Abbott conducted a risk assessment of appellant and agreed that his score on the STATIC-99R was two. Appellant's risk assessment score placed him in the average risk category, with a recidivism rate of approximately 3.6 percent over a period of five years.

Dr. Abbott believed it was improper to use other risk assessment tools because of appellant's advanced age of 83 years old. Dr. Abbott concluded that even if appellant suffered from a diagnosed mental disorder as defined by law, he still did not pose a serious and well-founded risk of reoffending. He had a five-year risk of 3.6 percent, which would continue to decline with each year of advancing age, and the risk was not more than a mere possibility. Appellant's risk of reoffending "was so low that it did not meet the standard of a substantial danger that is a serious and well[-]founded risk," and he did not consider appellant's risk to be high or more than a mere possibility.

**Verdict and Commitment Order**

On October 5, 2023, the jury found the petition's allegation true, that appellant met the definition of a sexually violent predator. On October 6, 2023, the trial court filed the order that committed appellant for an indeterminate term to a secure facility designated by the DSH.

On October 11, 2023, appellant filed a timely notice of appeal.

**DISCUSSION**

As noted above, appellant's counsel filed a brief with this court pursuant to *Wende* and *Ben C.*, but counsel also asked this court to exercise its discretion to independently review the record and address two specific issues: whether the jury's finding on the

17.

petition is supported by substantial evidence, and whether appellant was prejudiced by the admission of evidence about a nonqualifying prior sexual offense conviction.

In response to this court's invitation pursuant to *Wende*, appellant filed, in propria persona, a 33-page letter brief that raises numerous issues, including whether the jury's verdict is supported by substantial evidence, and arguments about the validity and constitutionality of the Act.

We exercise our discretion to review the issues raised in both the *Wende* brief and appellant's letter brief since there is some overlap in these contentions.

## I. The SVP Act

We begin with reviewing the relevant statutory provisions. "The Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq. … the Act) allows the state to petition superior courts for the involuntary civil commitment of certain convicted sex offenders whose diagnosed mental disorders make them a significant danger to others and likely to reoffend after release from prison." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 184 (*Walker*).)

An SVP is defined "as 'a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' " (*People v. Shazier* (2014) 60 Cal.4th 109, 126.)

"An alleged SVP is entitled to a jury trial, at which the People must prove three elements beyond a reasonable doubt:  (1) the person has suffered a conviction of at least one qualifying 'sexually violent offense,' (2) the person has 'a diagnosed mental disorder that makes the person a danger to the health and safety of others,' and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody." (*Yates*, *supra*, 25 Cal.App.5th at p. 477.)

18.

## A. Qualifying Offenses

To satisfy the first element, a finding that someone is an SVP requires only a single qualifying conviction. (Welf. & Inst. Code, § 6600, subd. (a)(1).) " 'Sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a): a felony violation of Section 261, 262, 264.1, 269, 286, 287, 288, 288.5, or 289 of, or former Section 288a of, the Penal Code, or any felony violation of Section 207, 209, or 220 of the Penal Code, committed with the intent to commit a violation of Section 261, 262, 264.1, 286, 287, 288, or 289 of, or former Section 288a of, the Penal Code." (Welf. & Inst. Code, § 6600, subd. (b).)

However, "[i]f the victim of an underlying offense that is specified in subdivision (b) of [Welfare and Institutions Code] Section 6600 is a child under the age of 14, the offense shall constitute a 'sexually violent offense' for purposes of Section 6600." (Welf. & Inst. Code, § 6600.1.)

When the victim is 14 years of age or older, "[f]or a conviction to be 'sexually violent,' the acts underlying the conviction must have been committed 'by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person.' ([Welf. & Inst. Code,] § 6600, subd. (b).)" (*People v. Burroughs* (2016) 6 Cal.App.5th 378, 403 (*Burroughs*).)

The term "force," as used in the context of forcible sex offenses, has no special legal meaning. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023.) The question is simply whether the defendant used force to accomplish an act of intercourse against the victim's will, not whether the force used overcame the victim's physical strength or ability to

resist.  (*Id*. at p. 1028.)  "Duress," in the context of rape, sodomy, and oral copulation, means " 'a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' "  (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005.)  Duress "can arise in a variety of ways related to psychological and/or situational factors between the perpetrator and the victim.…  ' "Where the defendant is a family member and the victim is young, … the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to the existence of duress.' "  (*People v. Guenther* (2024) 104 Cal.App.5th 483, 516 (*Guenther*).)

"These principles translate readily to other circumstances involving an uneven power dynamic between a victim and perpetrator inhabiting a position of authority.  While the 'relative ages and sizes' [citation] of the perpetrator and victim may not be as relevant to proving psychological compulsion or duress where … the victim is an adult, other factors related to ' "the position of dominance and authority of the defendant" ' [citation] remain salient."  (*Guenther*, *supra*, 104 Cal.App.5th 483, 516.)

Welfare and Institutions Code section 6600, subdivision (a)(3) states "[t]he existence of any prior convictions may be shown with documentary evidence.  The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the [DSH]."  The People may also introduce certified copies of records from any custodial facility " ' "in which" the defendant has been imprisoned to prove that a person has been convicted of a crime,' including a sexually violent offense."  (*Yates*, *supra*, 25 Cal.App.5th at p. 477, fn. 2.)

These provisions "allow[] the prosecution to prove the facts of a defendant's prior qualifying convictions not just with certain documents (like evaluations) but also with

multiple-level-hearsay statements contained therein (like police and probation reports, and victim and witness statements they include)." (*Walker*, *supra*, 12 Cal.5th at p. 198.) The Act's broad hearsay exception was enacted " 'to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions,' which may have occurred many years in the past." (*Yates*, *supra*, 25 Cal.App.5th at pp. 477–478; *Walker*, at pp. 198–199.)

"Whether an offense is 'sexually violent' is an issue a jury is competent to determine …." (*Burroughs*, *supra*, 6 Cal.App.5th at p. 403.) The trier of fact considers the offender's prior convictions for sexually violent crimes " ' "solely for evidentiary purposes" to help establish … current mental disorder and the likelihood of future violent sex crimes.' " (*People v. Vasquez* (2001) 25 Cal.4th 1225, 1232.)

## B. Diagnosed Mental Disorder

For the second element, the Act defines a diagnosed mental disorder "as 'a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' [Citations.] To establish this element, the People will have one or more experts evaluate the person, review documentary evidence (such as state hospital records, police and probation reports, and prison records), and render a diagnosis." (*Yates*, *supra*, 25 Cal.App.5th at p. 478.)

## C. Likelihood of Future Criminal Behavior

"For the third element, the People must show that, if released, the alleged SVP will likely engage in sexually violent criminal behavior due to the diagnosed mental disorder. [Citations.] The Act requires proof of a clear link between the second and third elements; that is, the finding of future dangerousness must be shown to derive from 'a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior.' [Citations.] Again, in the SVP trial the People will present expert testimony— usually based on diagnostic tools that predict future violent sexual behavior—to establish

21.

the alleged SVP's dangerousness and likelihood to reoffend." (*Yates, supra*, 25 Cal.App.5th at p. 478.)

## D.  Commitment Order.

"The trial represents the final step in the 'complex administrative and judicial process' required to civilly commit an individual as an SVP." (*Walker, supra*, 12 Cal.5th at p. 190.)  The statute lays out "a number of procedural protections for the conduct of trial, including the right to a jury and to the assistance of counsel and relevant experts. [Citation.]  At trial, the state bears the burden of proving beyond a reasonable doubt that the person is an SVP." (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 370.)

If the trier of fact finds the individual is an SVP, the court issues an order for an indefinite commitment "from which the individual can be released if it is shown that the individual no longer qualifies as an SVP.  [Citations.]  Under this system, a person who is committed as an SVP must be reexamined annually by a qualified mental health professional to determine whether commitment is still appropriate." (*Camacho v. Superior Court, supra*, 15 Cal.5th at pp. 370–371; *Walker, supra*, 12 Cal.5th at p. 190.)

## II.  Constitutional Claims

In his letter brief, appellant raises various constitutional challenges to the Act's provisions and argues a civil commitment is unconstitutional, and his due process rights were violated because the statute does not require evidence of a current act of sexual molestation.

Similar constitutional challenges to the Act have been rejected.  The Act does not violate a defendant's rights to due process and equal protection, it is not invalid under the ex post facto clause, the provisions are not void for vagueness, and the civil commitment does not violate the constitutional prohibition against double jeopardy. (*Needham v. Superior Court* (2024) 16 Cal.5th 333, 352; *People v. McKee* (2010) 47 Cal.4th 1172, 1188–1211; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1142–1143; *People v. Orey* (2021) 63 Cal.App.5th 529, 572, and cases cited within; *People v. McKee* (2012)

207 Cal.App.4th 1325, 1347.)  In addition, a statute substantially similar to the Act has been held constitutional by the United States Supreme Court.  (See, e.g., *Kansas v. Hendricks* (1997) 521 U.S. 346, 350 [upholding Kansas Sexually Violent Predator Act allowing commitment of people with a " 'mental abnormality' " who are likely to engage in " 'predatory acts of sexual violence' "]; *Hubbart*, *supra*, at pp. 1143, 1153–1155.)

## III.  The Jury's SVP Finding Is Supported by Substantial Evidence

In the *Wende* brief, appellate counsel requests this court to consider whether there is substantial evidence to support the jury's finding on the SVP petition "[i]n light of appellant's advanced age and average actuarial score on the Static[-]99R."

In his letter brief, appellant also asserts there is insufficient evidence to support each element required to prove the SVP petition.  Appellant argues the jury's true finding on the petition must be reversed because there is no evidence of a substantial danger that he will commit future crimes, his "alleged" mental disorder is "inactive" and will stay that way with treatment, there was insufficient evidence of his future dangerousness based on the experts' diagnostic tests, the experts' determinations of his future dangerousness was "meaningless" and not supported by substantial evidence, and the experts committed "professional negligence."

## A.  Review of the Jury's Finding

A person alleged to be an SVP is entitled to a jury trial where the People must prove the three requisite elements for an SVP petition beyond a reasonable doubt.  (*Yates*, *supra*, 25 Cal.App.5th at p. 477.)  On appeal, this court "reviews the sufficiency of the evidence in [the Act] cases under the same substantial evidence test used in criminal appeals.  [Citation.]  'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis

23.

whatever is there sufficient substantial evidence to support [the judgment]." ' " (*People v. Orey*, *supra*, 63 Cal.App.5th at pp. 560–561.)

**<u>B. Analysis</u>**

There is overwhelming evidence to support the jury's finding that the petition was true and appellant is an SVP. There were four experts who testified in this case: two for the People and two for appellant. All four experts reviewed the certified records for appellant's prior sexual molestation convictions committed on the three minors, and the court admitted those records into evidence. The experts also interviewed appellant, and testified to his statements about the nature and circumstances of those offenses.

Both prosecution experts, and one of appellant's experts, agreed the evidence established that appellant's prior convictions for sexually molesting A. in 1983, B. in 1999, and John Doe in 2014, constituted qualifying offenses within the meaning of the Act. The same three experts also agreed appellant had a diagnosed mental disorder that made him a danger to the health and safety of others, defined as sexual interest in prepubescent and pubescent children. All four experts generally agreed that appellant's scores on the actuarial tests minimized his risk to reoffend.

The major disagreement between the experts was the impact of appellant's age and physical conditions on his future risk. Drs. Damon and Zaw testified for the People that appellant's low actuarial scores underestimated and did not accurately capture appellant's actual risk level. They relied on appellant's history that showed he would have been scored at zero to a low risk of reoffending after his prior convictions for molesting A. and B., and he continued to reoffend shortly after being released from custody for each of his prior offenses, even when he was still on supervised release and attending sexual offender counseling. The People's experts also testified appellant reoffended after he started to suffer from medical problems, such as shingles and mobility issues. They testified that appellant's age and physical condition would not reduce his actual risk to reoffend because he did not rely on strength, speed, or endurance to molest the victims. Appellant

24.

instead relied on opportunity and manipulation to reoffend. He was generally healthy, he was not paralyzed or bedridden, he could perform the activities of daily living, and his energy level was still high.

Dr. Korpi, appellant's expert, acknowledged it was "weird" that appellant was 73 years old when he molested his grandson, John Doe, and admitted appellant was a statistical anomaly outside of the studies. However, Dr. Korpi believed appellant was not likely to reoffend based on his low risk levels measured by the actuarial tests and his current medical conditions. Dr. Korpi reached this conclusion based on the fact that appellant only molested John Doe twice, and testified that showed his sexual appetite had slowed down with age and his increasing health problems.

Dr. Korpi's conclusions on this point are undermined by the preliminary hearing for the charges based on John Doe, introduced into evidence as part of the record of conviction. The evidence showed appellant started to molest John Doe immediately upon meeting him in approximately mid-June 2013, when appellant's family picked him up in Washington and slept in the car on the drive back to California. Appellant's molestations of John Doe did not end because appellant lost interest. Instead, John Doe and his aunt arrived at the Los Banos Police Department on July 12, 2013, to make an appointment with a detective to report appellant's crimes. Bento interviewed John Doe that day, and the boy disclosed appellant's sexual molestations. John Doe's own father did not believe his son when he told him about the molestations. The record thus shows appellant's sexual molestations of John Doe ended only because the boy reported him to the police, and refutes the conclusion that appellant's sexual interests were slowing down because he was 73 years old.

In his letter brief, appellant asserts there was no evidence he showed "signs and symptoms" of a mental disorder in the six months prior to his trial on the SVP petition. Appellant claims his due process rights were violated because he could only be

committed as an SVP if he was diagnosed with a mental disorder at the time he was sentenced for molesting John Doe in 2014.

Dr. Zaw testified for the People that appellant's lack of sexual misconduct in prison was not relevant because there were no children around him. Indeed, arguments similar to those raised by appellant were rejected in *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1090. In *McCloud*, the appellant argued that even if there was sufficient evidence he suffered from a current mental condition as defined by the Act, there was no evidence that he was unable to control his behavior and likely to reoffend because "his crimes were committed long ago" and "his time in prison has been without incident." (*Ibid*.) *McCloud* rejected that argument and held that experts testified the appellant's difficulty controlling his behavior "was evidenced by the fact that he had committed rapes in the past, had been sanctioned with long term imprisonment, and had nevertheless reoffended shortly after his release." (*Ibid*.) "That [the appellant] had not exhibited difficulty controlling his behavior while in custody did not alter [the experts'] opinion concerning his impaired volitional capacity because '[i]n a confined environment the demonstration of behaviors can be highly restricted.' We note that [Welfare and Institutions Code] section 6600, subsection (d), provides: ' "Danger to the health and safety of others" does not require proof of a recent overt act while the offender is in custody.' " (*Ibid*.) We find *McCloud* persuasive and reject appellant's arguments herein.

There is thus overwhelming evidence to support the jury's finding that appellant was an SVP within the meaning of the Act.

## IV. Appellant's Prior Convictions

Both appellate counsel in the *Wende* brief, and appellant in his letter brief, raise issues about the trial court's admission of appellant's prior convictions at his jury trial on the SVP petition. We separately address these contentions.

## A.  The *Wende* Brief

In appellant's *Wende* brief, appellate counsel asked this court to address the following issue:

> "Did the trial court err by considering evidence regarding appellant's 1981 conviction from *New Mexico*, which it had ruled, in limine, to be inadmissible and which, accordingly, was not testified to by the prosecution's witnesses (although it was included among other layers of hearsay in documents admitted as evidence by stipulation of the parties)?  If so, in light of the other admissible evidence regarding appellant's other sexual offense convictions, was the error prejudicial?  (Italics added.)

There is no evidence in this record that appellant was convicted of committing a sexual molestation offense in New Mexico or that he was convicted of any prior offenses in 1981.  Counsel may have erroneously included this argument in the *Wende* brief.

To the extent counsel sought to challenge the evidence of appellant's prior convictions, we note that during pretrial motions before the jury trial on the SVP petition, appellant's counsel conceded appellant's convictions for molesting A. and B. constituted qualifying offenses under the Act because both victims were under the age of 14 years, and the record supports that concession.[6]

However, counsel moved to exclude evidence about appellant's prior convictions for sexually molesting John Doe in violation of section 288, subdivision (c)(1), and argued the convictions were not qualifying offenses since John Doe was 14 years old, and there was no evidence the offenses were committed with force or fear, as required by Welfare and Institutions Code section 6600, subdivision (b).  The prosecutor replied appellant committed the molestations "due to fear and duress" since "the minor child was asleep at the time that [appellant] had touched his genitals.  And … though he was awake

---

[6]     As noted *ante*, "[i]f the victim of an underlying offense that is specified in subdivision (b) of [Welfare and Institutions Code] Section 6600 is a child under the age of 14, the offense shall constitute a 'sexually violent offense' for purposes of Section 6600."  (Welf. & Inst. Code, § 6600.1.)

27.

when he felt the touching, he pretended to not be awake.  He pretended to still be asleep in hoping that it would stop, that [appellant] would just leave him alone.  It is the People's position that that is duress and fear and that even though he was awake, he remained still afraid to do anything."

The trial court denied appellant's motion to exclude and held the threshold question of whether a prior conviction qualifies as a sexually violent offense was a question of fact for the jury to determine.

To the extent appellate counsel challenges the Merced County convictions as being qualifying offenses, the court correctly declined to exclude this evidence.  There is substantial evidence that appellant's molestations of John Doe were qualifying offenses, based on Dr. Damon's testimony that appellant "engaged in the behavior by force because John Doe was sleeping at the time of the offenses and therefore could not resist [appellant's] advances," and his opinion about appellant's use of force is supported by the record.  There was also evidence of duress based on appellant's status as a family member, since " ' "the position of dominance and authority of the defendant and his continuous exploitation of the victim" is relevant to the existence of duress' " and the "uneven power dynamic between a victim and perpetrator inhabiting a position of authority."  (*Guenther*, *supra*, 104 Cal.App.5th at p. 516.)

## B.  Appellant's Letter Brief

In his letter brief, appellant argues the prior qualifying convictions should not have been admitted into evidence because they were prejudicial and too remote.

Appellant's prior convictions were not introduced under the provisions of Evidence Code sections 1101 and 352, or subject to exclusion for being remote or constituting prejudicial character evidence.  (See, e.g., *People v. Branch* (2001) 91 Cal.App.4th 274, 280–283.)  Instead, the trial court properly admitted the prior convictions as relevant for the People to prove the first requirement for an SVP petition, that "the person has suffered a conviction of at least one qualifying 'sexually violent

offense.' " (*Yates*, *supra*, 25 Cal.App.5th at p. 477.)  The trier of fact considers the offender's prior convictions for sexually violent crimes " ' "solely for evidentiary purposes" to help establish … current mental disorder and the likelihood of future violent sex crimes.' " (*People v. Vasquez*, *supra*, 25 Cal.4th at p. 1232.)

The jury herein was instructed as required by Welfare and Institutions Code section 6600, subdivision (a)(3), that it could not conclude appellant was a sexually violent predator "based solely on his alleged prior convictions without additional evidence that he currently has a diagnosed mental disorder .…" (CALCRIM No. 3454.)

## V.  Appellant's Other Contentions

In his letter brief, appellant offers his interpretation of the purported premise of the Act:  "[T]hat one who does not have an intimate (even sexual) relationship with another consenting individual, be suddenly branded an SVP and held indefinitely because of this lack of relationship being somehow closely related to deviant sexual behavior[.]" Appellant asserts that given this illegal purpose, he was "committed" to the DSH only because he was not cohabitating with anyone, that such an inference amounted to a "massive invasion of rights (including privacy)," and it was "unethical and unprofessional" for the experts to conduct "such a strenuous investigation into someone's life that may not necessarily be relevant to showing evidence of future criminality due to the lack of a companion."

In making these arguments, appellant has not cited specific evidence or testimony at his jury trial on the petition to support his claim that he was "committed" because he was not cohabitating with anyone.  The lone reference to appellant's living conditions occurred when Dr. Damon addressed appellant's lack of volitional control and likelihood to reoffend.  Dr. Damon testified that when appellant was married to A.'s mother, she would have been a consenting adult for a sexual relationship, but instead he chose to sexually molest a child and that showed his lack of volitional control.

29.

More importantly, appellant misstates the purpose of the SVP law. The Act "allows the state to petition superior courts for the involuntary civil commitment of certain convicted sex offenders whose diagnosed mental disorders make them a significant danger to others and likely to reoffend after release from prison. The purpose of the [Act] is to protect the public from a select group of criminal offenders (sexually violent predators, or SVPs), and to provide these offenders with the necessary treatment for their mental disorders." (*Walker*, *supra*, 12 Cal.5th at p. 184.)

As set forth *ante*, the experts for both the People and appellant focused exclusively on appellant's prior sexual molestations of the three minors, and his record of reoffending shortly after being released from custody, and never relied on his "cohabitation" history to conclude his prior convictions were qualifying offenses and he was a sexually violent predator.

Appellant further claims his due process rights were violated because the court imposed a "sentence" on him in violation of section 1170, subdivision (b), and aggravating and mitigating circumstances. Section 1170 addresses the determinate sentencing law. (§ 1170, subd. (b).) While a person who is alleged and found to be an SVP retains many procedural protections afforded to criminal defendants, the special proceedings on an SVP petition are civil in nature and the determinate sentencing law is inapplicable. (*Burroughs*, *supra*, 6 Cal.App.5th at pp. 383–384.)

After independent review of the record, we find no reasonably arguable factual or legal issues exist.

## DISPOSITION

The trial court's civil commitment order is affirmed.